J-A11013-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| RICHARD W. KINNARD, II | |
| Appellant | No. 1296 MDA 2017 |

Appeal from the Judgment of Sentence Entered March 22, 2017
In the Court of Common Pleas of Lebanon County
Criminal Division at No: CP-38-CR-0000443-2016

BEFORE:  STABILE, NICHOLS, and PLATT,[*] JJ.

MEMORANDUM BY STABILE, J.:　　　　　　**FILED SEPTEMBER 24, 2018**

Appellant, Richard W. Kinnard, II, appeals from the March 22, 2017 judgment of sentence imposing life in prison without parole for first-degree murder.  We affirm.

The trial court summarized the pertinent facts:

> This case arises from events that occurred on September 19, 2015 at Vinny's Good Time Night Club (hereafter "Vinny's") in the city of Lebanon.  About ten minutes before the club was scheduled to close, a dispute erupted between [Appellant], Jared Donovan Jones (hereafter "Jones") and a security officer employed by Vinny's.  The defendants were ejected from the premises.  After a short hiatus, [Appellant] returned to the nightclub. Shots were fired. Corey Bryan (hereafter "Bryan") was struck and killed.  Despite the fact that Vinny's was crowded when the shooting occurred, most patrons left the premises at or before the arrival of police.  No one professed to have seen the shooting.

_____

[*] Retired Senior Judge assigned to the Superior Court.

An investigation ensued. Eventually, that investigation was chronicled in a jury trial that took place in February of 2017.

The centerpiece of the Commonwealth's case in chief was footage from a videotape surveillance system at Vinny's. The videotape showed [Appellant] and Jones engaged in an argument with security officer Bryan. The tape also depicted [Appellant] and Jones leaving Vinny's and entering the parking lot. Shortly thereafter, the video depicted [Appellant] returning to the bar entrance. Another camera showed Bryan at the door toward which [Appellant] had been walking. The video depicted Bryan clutching his stomach and falling to the ground. Thereafter, most patrons scurried away. [Appellant] was caught on video running to a car. None of the camera views depicted the shooter or anyone else in possession of a firearm.

Vinny's surveillance system showed [Appellant] enter[ing] a car in the parking lot. The car then departed the parking area and turned north on Route 343. Shortly thereafter, North Lebanon Township Police were called to the scene of a one-vehicle accident north of the City of Lebanon. Sergeant Timothy Knight of the North Lebanon Township Police Department arrived at the scene of the crash, which was approximately two miles from Vinny's. When he arrived, no one was present in the vehicle. Upon additional investigation, Sergeant Knight learned that the vehicle was registered to [Appellant]. Blood was located throughout the vehicle. Wedged in behind the right rear headrest was a gun. Sergeant Knight checked the serial number of the firearm and learned that it had been stolen. When the vehicle was subsequently processed more completely, police also found a payment receipt for a loan registered to [Appellant], a medical paper pertaining to [Appellant], a letter from the Harrisburg Area Community College addressed to Jones, an LA Fitness paper in the name of [Appellant], a MoneyGram with [Appellant's] name on it, health documents from Memorial Hospital pertaining to [Appellant], and insurance paperwork in the name of [Appellant].

The gun found inside the BMW vehicle was sent for ballistics testing. In addition, bullets were found inside Vinny's and a projectile was recovered from the body of Bryan. Trooper Todd Neumyer, a firearms expert with the Pennsylvania State Police, testified that the bullets recovered from the body of Bryan and Vinny's were fired from the gun that had been located in the BMW vehicle that crashed.

The parties reached a stipulation that the blood recovered from the BMW vehicle was transmitted to the Pennsylvania State Police Crimes Laboratory for serology and DNA testing. There, a forensic DNA scientist by the name of Sabrine Panzer-Kaelin completed testing that revealed the existence of blood from [Appellant] and Jones inside the crashed BMW vehicle.

Following the crash of their BMW vehicle, both Jones and [Appellant] left the area. With respect to [Appellant], police learned that he purchased a bus ticket to travel from York, Pennsylvania, to Tucson, Arizona. The United States Marshals were contacted for assistance. Eventually, the Marshalls located [Appellant] in Tucson on January 26, 2016. […]

Following his apprehension, Jones provided a recorded statement to police. This statement became the focus of extensive pre-trial litigation[.] Eventually, the court crafted a statement that could be read to the jury. This statement incorporated some of [Appellant's] own words and some paraphrasing. The statement of Jones read to the jury focused upon the conduct of Jones and not the conduct of [Appellant]. Specifically, Jones admitted that he was at Vinny's on the night of the murder. He admitted that he had an argument with Bryan. He admitted that he drove the BMW vehicle belonging to William [Appellant] away from Vinny's. He acknowledged that he crashed the vehicle. After regaining consciousness following the crash, Jones acknowledged that he left the scene of the accident and that he left Lebanon County. In the statement, Jones denied having any knowledge or connection to the shooting death of Bryan.

Trial Court Opinion, 7/17/17, at 5-8 (record citations and some capitalization omitted).

At the conclusion of a lengthy joint trial, the jury found Appellant guilty of first-degree murder, third-degree murder, two counts of aggravated assault, receiving stolen property, discharge of a firearm into an occupied structure, flight to avoid apprehension, recklessly endangering another

- 3 -

person, and six counts of conspiracy.[1]  Appellant filed a timely post-sentence

motion, which the trial court denied on July 17, 2017.  This timely appeal

followed.  Appellant raises eight assertions of error:

1. Did the Commonwealth fail to present sufficient evidence at trial to prove beyond a reasonable doubt Appellant was the person who shot and killed the victim[?]

2. Did the trial court err by denying [Appellant's] pretrial motion to sever his case from [Jones]?

3. Did the trial court err by deferring decisions regarding [Appellant's] motion *in limine* until the time of trial where the deferment denying defense counsel's ability to effectively prepare for trial and Appellant's right to a fair trial? [sic]

4. Did the trial court err by admitting prison recorded phone calls between Charles Williams? [sic]

5. Did the collection of the prison recorded telephone calls and visitation recordings violated [sic] the Pennsylvania Wiretap Act and the Pennsylvania Supreme Court's decision in **Commonwealth v. Fant**[, 146 A.3d 1254 (Pa. 2016)]?

6. Did the trial court err by admitting [Appellant's] recorded phone calls and visitation recordings at the Lebanon County Correctional Facility where the contents of those recorded phone calls and visits provided the jury no relevant evidence regarding [Appellant's] consciousness of guilt and were extremely prejudicial in that his conversations exposed the jury to what sentence [Appellant] could receive if convicted, referenced privileged plea conversations between [Appellant] and defense counsel, and the admission of those phone calls placed defense counsel in the impossible position of explaining these conversations to the jury without simultaneously divulging privileged communications between himself and [Appellant]?

---

[1] 18 Pa.C.S.A. § 2502(a) and (c), 2702, 3925, 2701.1, 5126, 2705, and 903, respectively.

7. Did the trial court err by admitting a letter allegedly written by Appellant stating that [Jones] was not involved in the shooting where Jones' handwriting expert's report was not based on a valid and widely accepted scientific means of identifying a person's handwriting and Jared Jones' handwriting expert's conclusion stated that there was only a strong possibility that [Appellant] authored the text of the letter[?]

8. Did the trial court err by denying [Appellant's] motion *in limine* to exclude Detective Keith Uhrich's statement that he identified [Appellant] from the use of a JNET photograph and the surveillance video from the night of the shootings?

Appellant's Brief at 4-5 (reordered and some capitalization omitted).

Appellant first challenges the sufficiency of the evidence. Our standard of review is well settled. We must determine "whether the evidence, viewed in the light most favorable to the Commonwealth as the verdict winner, supports the jury's finding that every element of the offense was proven beyond a reasonable doubt." ***Commonwealth v. Hicks***, 156 A.3d 1114, 1123 (Pa. 2017). "The Commonwealth may sustain this burden by wholly circumstantial evidence and the jury is free to believe all, part, or none of the evidence." ***Id.*** "To obtain a first-degree murder conviction, the Commonwealth must demonstrate that a human being was unlawfully killed, the defendant did the killing, and the defendant acted with a specific intent to kill." ***Commonwealth v. Markman***, 916 A.2d 586, 597 (Pa. 2007). Moreover, the jury may convict the defendant as an accomplice so long as the facts adequately support the conclusion that he or she aided, agreed to aid, or attempted to aid the principal in planning or committing the offense, and acted with the intention to promote or facilitate the offense." ***Id.***

In his two-paragraph argument addressing this point, Appellant notes that no eyewitness observed him shoot Bryan, no eyewitness observed Appellant in possession of a gun, and the surveillance footage did not capture the shooting. Appellant does not acknowledge that the Commonwealth may prove its case with circumstantial evidence. *Commonwealth v. Brown*, 23 A.3d 544, 559 (Pa. Super. 2011). The evidence summarized in the trial court's opinion demonstrates that the Commonwealth produced an overwhelming body of circumstantial evidence implicating Appellant as the shooter. Appellant's sufficiency of the evidence argument fails.

Next, Appellant argues that the trial court erred in denying his pretrial motion to sever his case from that of Jones.

> The decision of whether to sever trials of co-defendants is within the sound discretion of the trial court. Both this Court and the United States Supreme Court have recognized that joint trials of co-defendants play a crucial role in the criminal justice system.
>
> It would impair both the efficiency and the fairness of the criminal justice system to require ... that prosecutors bring separate proceedings, presenting the same evidence again and again, requiring victims and witnesses to repeat the inconvenience (and sometimes trauma) of testifying, and randomly favoring the last tried defendants who have the advantage of knowing the prosecution's case beforehand. Joint trials generally serve the interests of justice by avoiding inconsistent verdicts and enabling more accurate assessment of relative culpability.

*Commonwealth v. Travers*, 768 A.2d 845, 846–47 (Pa. 2001). Normally, an appropriate jury instruction will suffice to address any evidence that is admissible against one defendant and not another. *Id.* at 847. However, in *Bruton v. United States*, 391 U.S. 123 (1968), the United States Supreme

- 6 -

Court held that the confession of a non-testifying defendant is inadmissible, regardless of any jury instruction, if it facially incriminates a co-defendant. Subsequently, courts have admitted such confessions if they are edited to omit direct references to a co-defendant. For example, in **Commonwealth v. Travers**, 768 A.2d 845 (Pa. 2001), the Pennsylvania Supreme Court held that a confession edited to refer to a co-defendant as "the other man," accompanied by a limiting instruction, was appropriate under **Bruton**.

Appellant's argument addresses the following portions of the trial court's summary of Jones' statement: "Jared Jones traveled with **two other guys** to Lebanon to celebrate [Jones'] birthday," and "[d]uring the evening of September 19, the **three gentlemen** ended up at Vinny's Goodtimes club." Appellant's Brief at 22 (emphasis added by Appellant). Appellant bolded the portions that the trial court redacted to omit Appellant's name.

We discern several fatal flaws in Appellant's argument. First, the statement is not facially incriminating. The fact that Jones went out Vinny's to celebrate his birthday with "two other guys" is not incriminating to any of the three men. Those facts become incriminating, if at all, only when linked with evidence that Jones was implicated in a murder that occurred at Vinny's that evening. Second, the redaction does not invite the jury to conclude that Appellant was one of the "two other guys."

By way of contrast, are the facts of **Gray v. Maryland**, 523 U.S. 185 (1998):

The witness who read the confession told the jury the confession (among other things) said,

> 'Question: Who was in the group that beat [the victim]?
>
> 'Answer: Me, deleted, deleted, and a few other guys.' [we will refer to this exchange as the first question and answer]
>
> Why could the witness not, instead, have said:
>
> 'Question: Who was in the group that beat [the victim]?
>
> 'Answer: Me and a few other guys.' [we will refer to this exchange as the second question and answer]

*Id.* at 196 (record citation omitted). The United States Supreme Court held the first question and answer (from the trial record) inadmissible under **Bruton**. According to **Gray**, the use of the word "deleted" invites the jury to conclude that a co-defendant's name was deleted, and to rely on that fact as evidence of the co-defendant's guilt regardless of any jury instruction to the contrary. The Supreme Court wrote, "Consider a simplified but typical example, a confession that reads, 'I, Bob Smith, along with Sam Jones, robbed the bank.' To replace the words 'Sam Jones' with an obvious blank will not likely fool anyone." *Id.* at 193. The **Gray** Court, however, reasoned that the second question and answer (the Court's own hypothetical), would not violate **Bruton**, because "statements that did not refer directly to the defendant himself and which became incriminating 'only when linked with evidence

- 8 -

introduced later at trial'" are admissible under **Bruton** and its progeny. **Id.** (quoting **Richardson v. Marsh**, 481 U.S. 200, 208 (1987)).

Following **Gray's** example, the Pennsylvania Supreme Court in **Travers** found no **Bruton** violation where a redacted confession referred to a co-defendant as "the other man."[2] **Id.** at 851-52. "The redacted statement here neither referred to appellant by name (the **Bruton** proscription) nor did it contain an obvious indication of a deletion or an alteration that was the functional equivalent of naming him (the **Gray** proscription)." **Id.** at 851. "Since the statement was not powerfully incriminating on its face, the general rule to which **Bruton** and **Gray** are a limited exception, *i.e.*, the almost invariable assumption of the law that jurors follow their instructions […] applies and controls." **Id.** (internal citations and quotation marks omitted).

Here, unlike **Gray**, the redacted portion of the confession did not answer an incriminating question (who beat the victim?) but an innocuous one (where and with whom did Jones go out to celebrate his birthday?). The redacted confession became potentially incriminating only when linked to other evidence, *i.e.*, facts implicating Jones in a murder that occurred at Vinny's that night. In light of all of the foregoing, we discern no **Bruton** violation in the

---

[2] The co-defendant told police he drove Travers to the scene with the intent of looking for a person with whom Travers had an argument earlier that day. **Id.** at 846. The co-defendant also admitted that he knew Travers was in possession of the gun used in the killing, and that he punched the victim and directed Travers to shoot him. **Id.** References to Travers were replaced with the "other man." **Id.**

redacted confession, and we discern no abuse of discretion in the trial court's denial of Appellant's severance motion.

Next, Appellant argues the trial court erred in deferring decision on various pre-trial motions seeking exclusion or admission of certain evidence, because the deferral hampered the effectiveness of Appellant's opening statement. Appellant claims the trial court deprived him of due process, but he cites no law pertaining to this specific issue.

> A motion *in limine* is a pre-trial application before a trial court made outside the presence of a jury, requesting a ruling or order from the trial court prohibiting the opposing counsel from referring to or offering into evidence matters so highly prejudicial to the moving party that curative instructions cannot alleviate an adverse effect on the jury. The purpose of a motion *in limine* is twofold: 1) to provide the trial court with a pre-trial opportunity to weigh carefully and consider potentially prejudicial and harmful evidence; and 2) to preclude evidence from ever reaching a jury that may prove to be so prejudicial that no instruction could cure the harm to the defendant, thus reducing the possibility that prejudicial error could occur at trial which would force the trial court to either declare a mistrial in the middle of the case or grant a new trial at its conclusion. Further, a ruling on a pre-trial motion *in limine* provides counsel with a basis upon which to structure trial strategy.

**Commonwealth v. Noll**, 662 A.2d 1123, 1125 (Pa. Super. 1995), **appeal denied**, 673 A.2d 333 (Pa. 1996).

Nonetheless, trial courts are permitted to defer rulings. **Commonwealth v. Metier**, 634 A.2d 228, 232 n.3 (Pa. Super. 1993). As our Supreme Court has explained, in certain circumstances, a deferred ruling is preferable:

Here, the trial court excluded proffered testimony pre-trial pursuant to Rule 403, a rule that, as explained *infra,* is generally not susceptible to accurate pre-trial evaluation. Unlike other rules of evidence, Rule 403 requires a trial court to weigh probative value and prejudice—the costs and benefits of relevant evidence— viewing it as part of a whole and not in isolation. Inherent in the rule is the assumption that the court has an adequate record, one that will mirror or provide great insight into what will develop at trial. In the majority of cases, and particularly manifested in this one, the trial court has no way of knowing beforehand exactly what evidence will be presented at trial. Depending on the case and the inevitable vagaries of litigation, the pre-trial record may be entirely different than the record that eventuates as matters unfold. Even if the evidence the parties intend to present is set, a trial rarely follows the anticipated script. The actual value of evidence may differ substantially from pre-trial expectations, depending on all manner of factors, such as the availability, appearance, memory, or demeanor of a witness, admissions on cross-examination, the defense theory, or the defendant's decision whether or not to testify. Even a relatively developed pre-trial record will be of limited utility in predicting the probative value or prejudice a particular piece of evidence will ultimately have.

Therefore, the ruling is better deferred until the situation is clear, not speculative.

***Commonwealth v. Hicks***, 91 A.3d 47, 52–53 (Pa. 2014).

Appellant argues the trial court erred in deferring judgment on his motion to exclude Jones' handwriting expert, his motion to exclude testimony regarding his gang affiliation and his motion to exclude the use of recorded phone calls. The trial court explained that it was unable to conduct a sufficient analysis prior to trial. Having reviewed the law, the parties' briefs, and the record, we reject Appellant's argument for the reasons explained on pages 26-32 of the trial court's July 7, 2017 opinion.

- 11 -

Next, Appellant argues the trial court erred in denying Appellant's pre-trial motion to exclude recorded phone calls Appellant made from prison. Detective Keith Uhrich, the Commonwealth witness who identified Appellant's voice in the recorded telephone call, testified that he never spoke with Appellant. Rather, he identified the voice in the recording as consistent with the voice in all of Appellant's phone calls recorded while he was in prison.

> In reviewing the ruling of a suppression court, our task is to determine whether the factual findings are supported by the record. If so, we are bound by those findings. Where, as here, it is the Commonwealth who is appealing the decision of the suppression court, we must consider only the evidence for the prosecution as read in the context of the record as a whole remains uncontradicted. Moreover, if the evidence supports the factual findings of the suppression court, this Court will reverse only if there is an error in the legal conclusion drawn from those findings.

**Commonwealth v. Fant**, 146 A.3d 1254, 1259 (Pa. 2016). We review the trial court's evidentiary rulings for abuse of discretion. **Commonwealth v. Serrano**, 61 A.3d 279, 290 (Pa. Super. 2013).

Rule 901 of the Pennsylvania Rules of Evidence governs the authentication of evidence, including voice identification:

> (5) *Opinion About a Voice*. An opinion identifying a person's voice—whether heard firsthand or through a mechanical or electronic transmission or recording—based on hearing the voice at any time under circumstances that connect it with the alleged speaker.

Pa.R.E. 901(b)(5). "[W]hen seeking to introduce testimony as to the content of a telephone conversation, the identity of the caller may be established by circumstantial evidence." **Commonwealth v. Stewart**, 450 A.2d 732, 733

- 12 -

(Pa. Super. 1982). Thus, a person familiar with the alleged speaker's voice may testify as to the identity of the speaker. ***Commonwealth v. Carpenter***, 450 A.2d 732, 733 (Pa. Super. 1982).

Nothing in Rule 901(b)(5) or our jurisprudence requires a face-to-face conversation between the identifying witness and the alleged speaker. The law simply requires familiarity with the alleged speaker's voice. The trial court explained:

> Detective Uhrich testified that during the course of his investigation, he listened to 150 telephone calls that were intercepted from [Appellant] while he was an inmate at the Lebanon County Prison. Detective Uhrich stated that some of these telephone calls were twenty minutes in length[,] and that he listened to [Appellant] telephone calls 'for a long period of time' extending up to one week before the date of trial. Detective Uhrich also stated that [Appellant] repeatedly prefaced many of his remarks with the phrase 'Do you understand what I'm sayin'?' Detective [Appellant] stated that during the conversation the Commonwealth sought to admit, [Appellant's] voice sounded identical with the voice he heard 150 times previously[,] and [Appellant] used the phrase 'Do you understand what I'm sayin'?'

Trial Court Opinion, 7/7/17, at 39.

Thus, Detective Uhrich was familiar with Appellant's voice from having listened to 150 recordings—some of those lengthy—of a voice that he knew to be Appellant's. He was also familiar with Appellant's speech patterns, particularly a phrase that he used frequently, "do you understand what I'm sayin?" The record supports the trial court's findings of fact, and we discern no legal error in its ruling.

- 13 -

Next, Appellant argues that the Lebanon County prison violated the Wiretap Act, 18 Pa.C.S.A. § 5701, *et. seq.*, when it recorded his telephone calls. The Wiretap Act provides in relevant part:

> It shall not be unlawful and no prior court approval shall be required under this chapter for:
>
> [...]
>
> (14) An investigative officer, a law enforcement officer or employees of a county correctional facility to intercept, record, monitor or divulge any telephone calls[3] from or to an inmate in a facility under the following conditions:
>
> [...]
>
> (B) Unless otherwise provided for in this paragraph, after intercepting or recording an oral communication, electronic communication or wire communication, only the superintendent, warden or a designee of the superintendent or warden or other chief administrative official or his or her designee, or law enforcement officers shall have access to that recording.

18 Pa.C.S.A. § 5704(14)(B), subsequently amended*,* 2017 P.L. 304, No. 22, § 2.

Appellant argues, without citation to authority, that Detective Uhrich did not qualify as a "designee" under § 5704(14)(B). Appellant quotes § 5704(14)(B) in his brief, but he omits the portion stating that law enforcement officers may have access to a recording of a prison phone call. Appellant's Brief at 26.

---

[3] The General Assembly subsequently deleted the phrase "telephone calls" and inserted "oral communications, electronic communications, or wire communications." 18 Pa.C.S.A. § 5704(14)(B), as amended.

- 14 -

Appellant also cites ***Commonwealth v. Fant***, 146 A.3d 1254 (Pa. 2016), for the proposition that in-person conversations between an inmate and visitor, separated by a glass screen using and speaking to each other using a telephone-like handset, are not subject to interception under the Wiretap Act because they are not telephone conversations. ***Fant*** shortly predated Appellant's trial, and he filed a pre-trial motion to exclude the recordings of his conversations in prison. However, Appellant fails to cite any evidence that the recorded conversations took place in person, rather than over a telephone line to a person outside of the prison. Indeed, his brief specifies that the calls were to an "outside number." Appellant's Brief at 16. Appellant therefore cannot obtain relief under ***Fant***. For the foregoing reasons, we reject Appellant's arguments under the Wiretap Act.

In his final three arguments, Appellant claims that the recorded telephone conversations were irrelevant and therefore inadmissible; that the trial court erred in admitting a letter allegedly written by Appellant because Jones' expert could not state that the signature was Appellant's; and that the trial court should not have permitted Detective Uhrich to identify Appellant by comparing a JNET photo to video surveillance footage. Appellant's Brief, at 27-28. Appellant fails to cite any pertinent legal authority or any record evidence in support of any of these arguments, and the final two arguments consist of a single sentence. Appellant has waived his final three arguments.

Pa.R.A.P. 2119(b) and (c); ***Commonwealth v. Williams***, 959 A.2d 1252, 1258 (Pa. Super. 2008).

Because we have found no merit in any of the arguments Appellant preserved for Appellate review, we affirm the judgment of sentence. We direct that a copy of the trial court's July 7, 2017 opinion be filed along with this memorandum.

Judgment of sentence affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 9/24/2018

ENTERED AND FILED
CLERK OF COURTS
LEBANON, PA

2017 JUL 17 PM 12:40

# IN THE COURT OF COMMON PLEAS OF LEBANON COUNTY

## PENNSYLVANIA

## CRIMINAL

COMMONWEALTH OF PENNSYLVANIA: NO. CP-38-CR-443-2016
        VS                     :
RICHARD W. KINNARD, II      :

---

COMMONWEALTH OF PENNSYLVANIA: NO. CP-38-CR-424-2016
        VS                     :
JARED DONOVAN JONES       :

APPEARANCES:

NICOLE EISENHART, Esquire      For The Commonwealth
First Assistant District Attorney
MEGAN RYLAND-TANNER, Esquire
First Deputy District Attorney

IAN M. EHRGOOD, Esquire        For Defendant Kinnard
JON W. ARNOLD, Esquire

NICHOLAS J. SIDELNICK, Esquire    For Defendant Jones
ELIZABETH JUDD, Esquire

## Opinion, Charles, J., July 17, 2017

Richard W. Kinnard, II and Jared Jones (Hereafter collectively referred to as DEFENDANTS) were convicted of shooting and killing a bouncer who had ejected them minutes before the Vinny's Good Times Nightclub was scheduled to close. The trial that resulted in the DEFENDANTS' convictions took place in February of 2017. Rarely have we presided over any Criminal Trial that produced as many esoteric legal issues as this one. Today, we will address many of those issues via

4

DEFENDANTS' Post-Sentence Motions. For reasons articulated below, we will deny all of the DEFENDANTS' Post-Sentence Motions.

## I.   FACTS

This case arises from events that occurred on September 19, 2015 at Vinny's Good Time Night Club (hereafter, "VINNY'S") in the city of Lebanon. About ten minutes before the club was scheduled to close, a dispute erupted between Richard Kinnard, II (hereafter "KINNARD"), Jared Donovan Jones (hereafter "JONES") and a security officer employed by VINNY'S. The DEFENDANTS were ejected from the premises. After a short hiatus, KINNARD returned to the nightclub. Shots were fired. Corey Bryan (hereafter "BRYAN") was struck and killed. Despite the fact that VINNY'S was crowded when the shooting occurred, most patrons left the premises at or before the arrival of police. No one professed to have seen the shooting. An investigation ensued. Eventually, that investigation was chronicled in a jury trial that took place during February of 2017.

The centerpiece of the Commonwealth's case in chief was footage from a videotape surveillance system at VINNY'S. The videotape showed KINNARD and JONES engaged in an argument with security officer BRYAN. The tape also depicted KINNARD and JONES leaving VINNY'S and entering the parking lot. Shortly thereafter, the video depicted KINNARD returning to the bar entrance. Another camera showed BRYAN at the door toward

5

which KINNARD had been walking. The video depicted BRYAN clutching his stomach and falling to the ground. Thereafter, most patrons scurried away. KNNARD was caught on video running to a car. None of the camera views depicted the shooter or anyone else in possession of a firearm. (See, e.g. N.T. 28-29; Exhibit 14).

VINNY'S surveillance system showed KINNARD enter a car in the parking lot. The car then departed the parking area and turned north on Route 343. (See, Exhibit 14). Shortly thereafter, North Lebanon Township Police were called to the scene of a one vehicle accident north of the City of Lebanon. Sergeant Timothy Knight of the North Lebanon Township Police Department arrived at the scene of the crash, which was approximately two miles from VINNY'S. (N.T. 227). When he arrived, no one was present in the vehicle. (N.T. 228). Upon additional investigation, Sergeant Knight learned that the vehicle was registered to William Kinnard. (N.T. 229). Blood was located throughout the vehicle. (N.T. 229). Wedged in behind the right rear headrest was a gun. (N.T. 229). Sergeant Knight checked the serial number of the firearm and learned that it had been stolen. (N.T. 230). When the vehicle was subsequently processed more completely, police also found a payment receipt for a loan registered to KINNARD, a medical paper pertaining to KINNARD, a letter from the Harrisburg Area Community College addressed to JONES, an LA Fitness paper in the name of KINNARD, a MoneyGram with KINNARD's name on it,

6

health documents from Memorial Hospital pertaining to KINNARD, and insurance paperwork in the name of Patty Kinnard (N.T. 256-258).

The gun found inside the BMW vehicle was sent for ballistics testing. (N.T. 260). In addition, bullets were found inside VINNY'S and a projectile was recovered from the body of BRYAN. (N.T. 261). Trooper Todd Neumyer, a firearms expert with the Pennsylvania State Police, testified that the bullets recovered from the body of BRYAN and at VINNY'S were fired from the gun that had been located in the BMW vehicle that crashed. (N.T. 286-287)

The parties reached a stipulation that the blood recovered from the BMW vehicle was transmitted to the Pennsylvania State Police Crimes Laboratory for serology and DNA testing. There, a forensic DNA scientist by the name of Sabine Panzner-Kaelin completed testing that revealed the existence of blood from KINNARD and JONES inside the crashed BMW vehicle. (N.T. 307-309).

Following the crash of their BMW vehicle, both JONES and KINNARD left the area. Detective Keith Uhrich chronicled the efforts made by police to locate both men. With respect to KINNARD, police learned that he purchased a bus ticket to travel from York, Pennsylvania, to Tucson Arizona. (N.T. 419). The United States Marshalls were contacted for assistance. (N.T. 419; 421). Eventually, the Marshalls located KINNARD in Tucson on January 26, 2016. (N.T. 421-422). With respect to JONES,

Detective Uhrich communicated with his sister and his mother. On January 27, 2016, JONES was apprehended in Hershey, Pennsylvania. (N.T. 423).

Following his apprehension, JONES provided a recorded statement to police. This statement became the focus of extensive pre-trial litigation that will be chronicled within the body of this Opinion. Eventually, the Court crafted a statement that could be read to the jury. This statement incorporated some of JONES' own words and some paraphrasing. The statement of JONES read to the jury focused upon the conduct of JONES and not the conduct of KINNARD. Specifically, JONES admitted that he was at VINNY'S on the night of the murder. He admitted that he had an argument with BRYAN. He admitted that he drove the BMW vehicle belonging to William Kinnard away from VINNY'S. He acknowledged that he crashed the vehicle. After regaining consciousness following the crash, JONES acknowledged that he left the scene of the accident and that he left Lebanon County. In the statement, JONES denied having any knowledge or connection to the shooting death of BRYAN. (See, Exhibit 32:N.T. 425-431)

After KINNARD and JONES were apprehended by police, they were confined at the Lebanon County Correctional Facility. The Correctional Facility possesses a system by which telephone calls involving inmates can be monitored and recorded. Every inmate is advised in advance that his/her telephone calls are subject to interception and recording. (February 6, 2017 N.T. 4-6). Several telephone calls of note involving KINNARD were

8

intercepted and recorded. Specifically, the phone calls included the following:

- On March 27, 2016, KINNARD told an unidentified female that "I got some time to do" and the time would be measured in "years". (N.T. 433)

- On March 29, 2016, KINNARD told an unknown individual "I am looking at some time" and he references that he will be in prison at least ten years. He indicated that he wanted to "prepare" his family for that reality. (N.T.433)

- On May 7, 2016, the DEFENDANT complained to an unknown female about how the Lebanon District Attorney wanted to lock him up for life. In that conversation, he indicated that he would take a "reasonable" plea bargain deal. (N.T.433)

These telephone calls were the focus of a pre-trial proceeding. On February 6, 2017, this Court issued a nine-page Opinion. We overruled KINNARD's objections based upon relevance and the plea bargain privilege. A final decision regarding the phone calls was deferred until trial. At trial, we permitted the jury to hear the phone calls and we afforded wide latitude for the defense to explain why the statement made by KINNARD during the telephone calls should not reflect his consciousness of guilt.

After a trial that lasted more than one week, a jury rendered numerous verdicts. Those verdicts, and the charges to which they pertained are set forth on the following charts:

9

## COMMONWEALTH v. KINNARD

| COUNT NUMBER | CHARGE | VERDICT |
|---|---|---|
| I | First Degree Murder | Guilty |
| II | Conspiracy-First Degree Murder | Guilty |
| III | Aggravated Assault | Guilty |
| IV | Conspiracy-Aggravated Assault | Guilty |
| V | Aggravated Assault | Guilty |
| VI | Conspiracy-Aggravated Assault | Guilty |
| VII | Conspiracy-Person Not to Possess Use, Manufacture, Control, Sell or Transfer Firearms | Guilty |
| VIII | Receiving Stolen Property | Guilty |
| IX | Discharge of a Firearm Into an Occupied Structure | Guilty |
| X | Flight to Avoid Apprehension, Trial or Punishment | Guilty |
| XI | Conspiracy, Flight to Avoid Apprehension, Trial or Punishment | Guilty |
| XII | Recklessly Endangering Another Person | Guilty |
| XIII | Criminal Homicide-Third Degree Murder | Guilty |
| XIV | Conspiracy, Criminal Homicide Third Degree Murder | Guilty |

## COMMONWEALTH v. JONES

| COUNT NUMBER | CHARGE | VERDICT |
|---|---|---|
| I | First Degree Murder | Guilty |
| II | Conspiracy-First Degree Murder | Guilty |
| III | Aggravated Assault | Guilty |
| IV | Conspiracy-Aggravated Assault | Guilty |
| V | Aggravated Assault | Guilty |
| VI | Conspiracy-Aggravated Assault | Guilty |
| VII | Flight to Avoid Apprehension, Trial or Punishment | Guilty |
| VIII | Conspiracy, Flight to Avoid Apprehension, Trial or Punishment | Guilty |
| IX | Criminal Homicide-Third Degree Murder | Guilty |
| X | Conspiracy, Criminal Homicide Third Degree Murder | Guilty |

10

The DEFENDANTS appeared for sentencing March 22, 2017. We did our duty by imposing the mandatory life imprisonment sentence for first degree murder for both DEFENDANTS. In addition, we also imposed additional terms of imprisonment on other counts.

## II. ISSUES

Both JONES and KINNARD have raised numerous issues for our consideration. Several issues are identical and many others intersect with one another. That is why we have chosen to address both co-defendants' issues within this one joint opinion. The issues we will be addressing, and the party who raised the issue are listed below:

(A)     Weight and sufficiency of evidence (JONES and KINNARD)

(B)     Refusal of the Court to sever the cases against each Defendant (JONES and KINNARD)

(C)     Voluntary Intoxication (JONES)

(D)     Refusal of the Court to compel KINNARD to give handwriting exemplar (JONES)

(E)     Handwriting Authentication (KINNARD)

(F)     Deferring decisions on Motion in Limine until Trial (KINNARD)

(G)     Admitting recorded phone calls intercepted from prison (KINNARD)

(H)     Permitting identification of DEFENDANT from a JNET photo (KINNARD)

11

## III.  DISCUSSION

### A. Weight & Sufficiency of Evidence (Jones & Kinnard)

When reviewing a sufficiency of the evidence claim, we apply a two-step inquiry.  First, we consider all of the evidence in the light most favorable to the Commonwealth, accepting as true all evidence upon which the fact-finder could have based the verdict.  Second, we must ask whether that evidence, along with all reasonable inferences to be drawn therefrom, was sufficient to prove guilt beyond a reasonable doubt.  *Commonwealth v. Azim*, 459 A.2d 1244, 1246 (Pa. Super. 1983).  In passing upon the credibility of witnesses and the weight of the evidence, the jury is at liberty to believe all, part, or none of the evidence.  *Commonwealth v. Price*, 610 A.2d 488 (Pa. Super. 1992).  We are not to engage in post-verdict credibility discussions, nor are we permitted to substitute our opinion regarding the facts for that of the jury.  *Commonwealth v. Brown*, 486 A.2d 441 (Pa. Super. 1984).  If the fact-finder could have reasonably determined from the evidence that all of the necessary elements of the crime were established, then that evidence will be deemed sufficient to support the verdict. *Commonwealth v. Hopkins*, supra. at 913-14.  With the above in mind, we will proceed to analyze the facts of this case and the various charges against these Defendants.

12

Although closely related, there is a distinction between challenges to sufficiency and lack of weight of evidence. That distinction was explained in *Commonwealth v. Whiteman*, 485 A.2d 459 (Pa. Super. 1984):

> A motion for new trial on grounds that the verdict is contrary to the weight of the evidence concedes that there is sufficient evidence to sustain the verdict but contends, nevertheless, that the verdict is against the weight of the evidence. Whether a new trial should be granted on grounds that the verdict is against the weight of the evidence is addressed to the sound discretion of the trial judge...The test is not whether the court would have decided the case in the same way but whether the verdict is so contrary to the evidence as to make the award of a new trial imperative so that right may be given another opportunity to prevail.

*Id.* at page 462, citing *Commonwealth v. Taylor*, 471 A.2d 1228, 1229-1230 (Pa. Super. 1984). If there is insufficient evidence to support a jury's verdict, the double jeopardy clause of the Fifth Amendment to the United States Constitution precludes retrial. See *Commonwealth v. Whiteman*, supra, citing *Hudson v. Louisiana*, 450 U.S. 40, 67 L.Ed.2d 30 (S.Ct. 1981). On the other hand, "a new trial is a proper remedy when the verdict is found to be against the weight of the evidence". *Commonwealth v. Whitman*, supra at page 461.

The standard to be applied when assessing a challenge to the weight of evidence imposes a "heavy burden" upon the defendant. *Commonwealth v. Staton*, 1998 WL 1297080 (Pa. C.P. 1998). A jury's verdict will be overturned only when it is "so contrary to the evidence as to shock one's sense of justice..." *Commonwealth v. Schwartz*, 615 A.2d

13

350, 361 (Pa. Super. 1992). Of course, when addressing a weight of evidence claim, it is not our role to substitute our credibility judgment for that of the jury. "[Credibility decisions] is a function that is solely within the province of the finder of fact which is free to believe all, part or none of the evidence." *Commonwealth v. Murray*, 597 A.2d 111, 114 (Pa. Super. 1991).

In this case, the Commonwealth has presented significant evidence that is more than sufficient to establish the DEFENDANTS' guilt. Without being inclusive, the evidence presented by the Commonwealth included the following:

- Video evidence that both JONES and KINNARD were present at VINNY'S on the evening of the homicide.
- Testimony from witnesses and through videotape that an argument ensued between JONES, KINNARD and BRYAN that resulted in the ejection of JONES and KINNARD from VINNY'S.
- Videotape evidence revealed that JONES left VINNY'S in a highly agitated state.
- The video depicted that JONES and KINNARD left the club and proceeded to a car. KINNARD then was depicted coming back to the entrance of VINNY'S. A separate camera depicted BRYAN being shot at or near the time when KINNARD walked toward the entrance.

14

- The video depicted JONES and KINNARD leaving VINNY'S and proceeding north on Route 343.

- A BMW vehicle was involved in a one car crash approximately 2 miles to the north of VINNY'S at or near the time when police were called to the scene of a shooting at VINNY'S.

- The occupants of the vehicle fled from the scene of the crash.

- The BMW vehicle involved in the crash was registered to William Kinnard, who is a relative of KINNARD. Numerous documents were found in the vehicle that linked KINNARD to it. One document that was pertaining to JONES was also found in the vehicle.

- Blood from both JONES and KINNARD was found inside the vehicle.

- A gun was located inside the vehicle. Ballistics testing linked this gun to bullets found in VINNY'S and inside the corpse of BRYAN.

- Following the crash of the BMW vehicle, both KINNARD and JONES left the geographic area. KINNARD went to Arizona.

- JONES provided a statement in which he acknowledged being present at VINNY'S, he acknowledged being involved in an argument with BRYAN and he acknowledged driving the BMW vehicle away from VINNY'S. In his statement, JONES also

15

admitted that he left the scene of the crash and left the Lebanon area following the shooting.

- KINNARD made statements to numerous people in which he acknowledged that he was facing significant time in prison. One of the conversations included a statement by KINNARD that he would enter a plea of guilty if he received a plea bargain that was to his liking.

All of the above information, when viewed in the light most favorable to the Commonwealth, is sufficient to establish the guilt of both KINNARD and JONES. Moreover, nothing about the juries' verdict shocks our conscience. Therefore, the DEFENDANTS' arguments based upon sufficiency and weight of the evidence must be and are rejected.

## B. Severance (Jones & Kinnard)

Both KINNARD and JONES believe that they should have been tried separate and apart from one another. In fact, the issue of severance is one that KINNARD's counsel raised at practically every opportunity. KINNARD's argument in favor of severance was predicated upon a statement provided by JONES to Police that was read in part at trial. KINNARD argued that this statement "facially incriminated" him. (KINNARD's brief at page 18) We disagree both factually and legally with KINNARD'S argument.

16

From a factual perspective, we examined carefully the statement from JONES that we permitted the jury to hear.[1] Even had KINARD's name been emblazoned in the statement, it would not have implicated him in the crime of homicide. JONES never described any fight or argument between KINNARD and the victim. JONES never stated that he saw a gun or heard any shots. He denied knowing anything at all about the homicide. At no time did JONES place KINNARD in possession of a gun and at no time did JONES label KINNARD as the trigger man. The most that could be gleaned about "the other guy" from the statement we allowed the jury to hear was that he arrived and left with JONES on the night of the homicide. Numerous other witnesses also placed KINNARD at the scene and KINNARD'S attorney never attempted to challenge that his client was present. Under such circumstances, we do not view the statement we permitted the jury to hear as "facially incriminating" of KINNARD.[2]

From a legal perspective, KINNARD himself recognized: "The Pennsylvania Supreme Court and the United States Supreme Court have recognized that joint trials of co-defendants play a crucial role in the

---

[1] This statement was marked "Final Draft 1-19-2017".

[2] To be sure, had we adopted the Commonwealth's position that the entire thirty-seven page transcript be read, except that the term "the other guy" should be used in place of KINNARD, then the statement would have been much more incriminating toward "the other guy", especially given the nature of the questions asked by Police Officers. As it is, our paraphrasing of JONES' statement focused on JONES' own conduct, and not that of his co-conspirators.

17

Criminal Justice System..." (KINNARD's brief at page 17). The Pennsylvania Rules of Criminal Procedure permit a joint trial where the DEFENDANTS are alleged to have participated in the same criminal event. Pa. R. Crim. P. 582. Our Supreme Court has declared that when conspiracy is charged, a joint trial is "preferred". *Commonwealth v. King*, 721 A. 2d 763, 771(Pa. 1998). In fact, our Commonwealth's highest court has stated:

> "The mere fact that there is hostility between defendants, or that one may try to save himself at the expense of the other, is in itself not sufficient grounds to require separate trials. In fact, it has been asserted that the fact that defendants have conflicting versions of what took place, or the extents to which they participated in it, is a reason for rather than against a joint trial because the truth may be more easily determined if all are tried together." *Commonwealth v. Birdsong*, 24 A. 3d 319, 336 (Pa. 2001) (citations omitted).

With the above general rule having been acknowledged, we would be remiss if we did not recognize that "a common problem [in a joint trial] arises in situations where evidence is admissible against one co-defendant but inadmissible against another." *Commonwealth v. Travers*, 768 A. 2d 845, 846 (Pa. 2001). In legal parlance, this problem has been referred to as the "Bruton Dilemma" in recognition of the key case of *Bruton v. United States*, 391 U.S. 123 (1968).

*Bruton* involved an armed robbery of a post office. A postal inspector testified that one of the co-conspirators orally confessed to him and implicated his accomplice. In a joint trial conducted against both the defendant and the co-conspirator who confessed, the confession was admitted. The United States Supreme Court reversed the conviction, reasoning that "The introduction of [the co-conspirator's] confession posed

a substantial threat to Petitioner's right to confront the witnesses against him, and this is a hazard we cannot ignore." *Id* at page 137.

Shortly after *Bruton* was decided, prosecutors attempted to avoid the confrontation issue inherent in statements by co-conspirators by redacting the name of the non-confessing defendant from the confession. The efficacy of this practice made its way to the United States Supreme Court in 1998. In *Gray v. Maryland*, 523 U.S. 185 (1998), our nation's highest court declared that replacement of the non-confessing name with a neutral pronoun such as "the other guy" was consistent with the Sixth Amendment to the United States Constitution. However, the Court in *Gray* cautioned that if a redacted statement "facially incriminates" the defendant, it could still violate the Sixth Amendment.

Needless to say, *Bruton* and *Gray* spawned a literal library of decisions about when and how a co-conspirator's confession can be admitted in a joint trial. In the four decades that have transpired since *Bruton*, practically every permutation of facts pertaining to confessions of co-defendants have been addressed by Courts across this country. In Pennsylvania, the body of *Bruton*-spawned case law is about as mature as it gets.

Our Commonwealth's highest court has repeatedly declared that when a confession can be redacted so that it does not refer specifically to the defendant and can retain its narrative integrity, the defendant's Sixth Amendment right to confrontation is not violated. *Commonwealth v.*

19

*Johnson*, 378 A. 2d 859 (Pa. 1977); *Commonwealth v. Wharton*, 607 A. 2d 710; *Commonwealth v. Lopez*, 739 A. 2d 485 (Pa. 1999). As the Commonwealth repeatedly argued during trial, redaction of a statement to remove the defendant's name and refer to him merely as "the other guy" is a practice that has been approved in our Commonwealth. *Commonwealth v. Travers*, 768 A. 2d 845 (Pa. 2001). The mere fact that it would be possible for the jury to speculate that the defendant was "the other guy" is not enough to cause a violation of the Sixth Amendment. *Commonwealth v. Lopez*, 739 A. 2d 485 (Pa. 1999).

In this case, the Commonwealth presented a thirty-seven (37) page transcript from the recorded interview of Jared JONES. The Commonwealth asked the Court to admit the statement verbatim with the exception of redacting Mr. KINNARD's name to insert "the other guy". Instead of adopting this approach, we reviewed and summarized the statement of Jared JONES and forwarded a copy of our work product to all counsel. The Commonwealth consistently objected based upon the theory that the entire statement should have been read with only Mr. KINNARD's name redacted. Both KINNARD and JONES also objected because they found the Court's paraphrasing of JONES' statement to be "misleading."

We considered the arguments set forth by all counsel. Letters were written back and forth between counsel and the Court regarding the contents of the statement. (See Court Order of January 19, 2017 and

20

attachments). From the beginning, we rejected the Commonwealth's request to read the entire statement.[3] We also disagreed with some of the arguments proffered by defense counsel, but we did modify what we had initially prepared based upon other arguments presented. After proceeding through several iterations of a Court approved statement, we ended up sending a letter to counsel on January 19, 2017. In that letter we stated:

> "At the risk of repeating myself, I will not grant the Commonwealth's request to simply insert "the other guy" in the transcript whenever Mr. KINNARD's name is listed. I have reached this decision for many reasons. The most important are:
>
> (1)That much of the transcript reflects opinions of Police Officers in the form of questions that were not adopted by Mr. JONES; and
> (2) Simply inserting "the other guy" makes it too obvious that JONES is speaking about KINNARD.
>
> In reading Mr. Sidelnick's submission, it is obvious that what Mr. KINNARD actually seeks is severance of his case from that of Mr. JONES. I will not sever the two cases and allow both defendants to point the finger at each other in absentia. It is my belief that if separate trials were to be conducted, the truth of what occurred would suffer. As noted above, I have employed paraphrase in an effort to soften any link between Mr. JONES and Mr. KINNARD. I have done my best to strike a balance between Mr. KINNARD's rights under ***Bruton*** and the Commonwealth's legitimate desire to present the essence of what Mr. JONES stated about his own conduct.
>
> With respect to Mr. Ehrgood's comments, I find them to be largely hyperbolic. I have read and re-read Mr. JONES' statement. I believe that the latest draft of that statement captures the essence of what Mr. JONES stated to Police Officers. Whenever possible, I used Mr. JONES' own words. I do not believe that the document I drafted is misleading.

---

[3] There were numerous reasons for this decision. (See Court Order of January 19, 2017 and attachments.) One of the biggest reasons was the concern of the Court about the nature of the questions asked by police that were not answered affirmatively by JONES; the questions themselves implicated KINNARD in ways that JONES' responses did not.

I have heard it said by many Judges that "If everyone is unhappy, that means the decision must be fair." In some ways, I adhere to that precept as it relates to the statement of Jared JONES. Other than modifying the language of the statement slightly, I stand by the statement that I drafted. To the extent necessary, the objections submitted by each of you are overruled." (Letter to counsel of January 19, 2017)

As is obvious, this Court expended considerable effort to strike a balance between the Commonwealth's need to present Mr. JONES' statement and the DEFENDANTS' stated concerns. In doing so, our goal was to focus the statement upon JONES' own conduct without significant emphasis upon what "the other guy" did or did not do. This task was admittedly difficult, but after numerous iterations and consultation with all counsel, we believe that the Final Draft dated January 19, 2017, accomplished both goals.

In the opinion of this Court, the existence of JONES' statement cannot and will not justify severance of a case that could result in mutual finger pointing by defendants in separate trials. Had we severed the above-referenced case, it would have been easy for KINNARD to point the finger at JONES and say "He did it." In a separate trial, JONES could have taken the stand and pointed to KINNARD as the trigger man. Without conclusive video evidence and without the other defendant present to defend himself, the truth of what occurred at VINNY'S could have been obscured. This is a result that this Court did not want to risk. By reaching this conclusion,

we did not err.[4]

## C. Intoxication (Jones)

JONES argues that this Court erred by failing to instruct the jury on the concept of Voluntary Intoxication. This is an issue that we address in a fifteen page written opinion authored during trial on February 11, 2017. To the extent necessary, we incorporate our February 11, 2017, opinion by reference and rest based upon what we set forth in that opinion.

## D. Handwriting Exemplars (Jones)

In his Post-Sentence Motion, JONES complains that the Court refused his request to require that KINNARD provide handwriting exemplars. These exemplars were requested because JONES wanted to introduce a letter written by KINNARD that exculpated him. Frankly, we do not completely understand JONES' complaint about this issue.

The issue of handwriting exemplars was first raised at a Pre-Trial hearing on December 19, 2016. At that time, counsel for JONES indicated that he had hired a handwriting expert to authenticate a letter written by KINNARD. He asked the Court to order that KINNARD prepare handwriting exemplars. We did not immediately grant JONES' request because we were

---

[4] Our Appellate Courts have declared that a harmless error analysis can apply in a *Bruton* situation. Given the non-accusatory nature of JONES' statement as it relates to KINNARD, this case illustrates the concept that even if the Court erred, its error was harmless because it did not impact the case presented by the Commonwealth against KINNARD.

23

concerned about KINNARD's right against self-incrimination. (12-19-16 N.T. 20-21) During the course of conversation, we learned that the handwriting expert could possibly produce an opinion based upon existing documents disclosed during the course of discovery. We decided that an attempt should be made to analyze handwriting via existing documentation before a Court Order was entered to require action on the part of KINNARD. The following exchange occurred:

"The Court: Okay. But before we undertake a coercive requirement that Mr. Kinnard write out exemplars, I'm going to make you exhaust your other options. Because if your expert can render an opinion based upon those other letters that are not affected by any taint whatsoever, I'm going to have her do that.

Mr. Ehrgood: That's understandable.

The Court: [If you] absolutely, positively must have the exemplars, then I'll address it, and you may not get them. But before we even go there, I want your expert to look at the resources that are available right now without having to make Mr. Kinnard do anything that could implicate himself.

Mr. Ehrgood: Understood. (12-19-16 N.T.23)"

We did not hear anything further about the handwriting expert until the time of trial. Prior to the submission of her opinion to the jury, JONES' expert, Sandra Miller-Raudabaugh (hereafter MILLER) was questioned extensively about her opinion and the level of certainty that served at its foundation. We advised the parties in advance: "In terms of her ultimate opinion, whatever that ultimate opinion is has to be to a reasonable degree of certainty. That is what your question has to be." (N.T. 458). Unfortunately, we did not get an answer to that question. Therefore, after

24

extensive questioning by counsel, the Court excused the jury from the Court Room and directly asked MILLER whether she could express an opinion regarding the handwriting on the proffered letter "to a reasonable degree of certainty". Because MILLER responded to this question in the affirmative, this Court admitted the letter in evidence and permitted the jury to hear its contents.

There are multiple reasons why JONES' argument regarding handwriting exemplars must fail. First and foremost, we never reached a final decision regarding JONES' request for exemplars. As highlighted in the transcript, our decision on December 19 was to order JONES to explore his other options. We clearly advised JONES' attorney that if he was unsuccessful in obtaining an opinion from his expert, we would then "revisit" the issue. We never revisited the issue because counsel never asked us to do so.

Even more important, the lack of handwriting exemplars ultimately had no impact on the trial. The letter that triggered the request for exemplars was admitted at trial without the exemplars. Thus, the jury saw and had the opportunity to consider the contents of the letter. This fact, by itself, repudiates JONES' argument that our decision regarding handwriting exemplars somehow requires a new trial.

## E. Deferring Motion in Limine (Kinnard)

KINNARD proffers the creative but misplaced argument that this Court erred by failing to immediately rule on his Motions in Limine. KINNARD argued in his brief:

> "Because the Trial Court deferred judgment and made no final decisions regarding KINNARD's Motions in Limine, defense counsel was forced to give a very general opening statement with little to no reference to facts because defense counsel did not know what evidence would be deemed admissible at trial." (KINNARD's brief at page 20)

The purpose of a Motion in Limine is two-fold: (1) to provide the Trial Court with a pre-trial opportunity to weigh evidentiary objections; and (2) to give the Trial Court the opportunity to prevent evidence from ever reaching a jury that may prove to be so prejudicial that no instruction could cure the harm to a defendant. See, e.g. *Commonwealth v. Noll*, 662 A. 2d 1123, 1125 (Pa. Super. 1995). No court is required to immediately rule on a Motion in Limine. As our Superior Court has stated: "Although a Motion in Limine is generally made before trial, the Trial Court may elect to rule upon the application at a later time." *Commonwealth v. Metier*, 634 A. 2d 228, 232 (N.3) (Pa. Super. 1993). One Trial Court has even declared "Plaintiff's assertion that the Court erred in not adjudicating his Motion in Limine is nonsense. A party does not have the right to pre-trial ruling upon legal issues from the Trial Judge." *Gillen v. Trovato*, 14 Pa. D & C 5th 380 (2010).

When the admissibility issue implicates a probative value versus prejudicial effect analysis, our Commonwealth's highest court has

26

instructed that Trial Courts *should* wait until trial before deciding the issue. In *Commonwealth v. Hicks*, 91 A. 3d 47, 52-53 (Pa. 2014), the Court stated:

"Here, the Trial Court excluded proffered testimony pre-trial pursuant to Rule 403, a rule that, as explained infra, is generally not susceptible to accurate pre-trial evaluation. Unlike other Rules of Evidence, rule 403 requires a Trial Court to weigh probative value and prejudice – the cost and benefits of relevant evidence – reviewing it as part of a whole and not in isolation. Inherent in the Rule is the assumption that the Court has an adequate record, one that will mirror or provide great insight into what will develop in trial. In the majority of cases, and particularly manifested in this one, the Trial Court has no way of knowing beforehand exactly what evidence will be presented at trial. Depending on the case and the inevitable vagaries of litigation, the pre-trial record may be entirely different than the record that eventuates as matters unfold. Even if the evidence the parties intend to present is set, a trial rarely follows the anticipated script. The actual value of evidence may differ substantially from pre-trial expectations, depending on all manner of factors, such as the availability, appearance, memory or demeanor of a witness, admissions on cross-examination, the defense theory, or the defendant's decision whether or not to testify. Even a relatively developed pre-trial record will be of limited utility in predicting the probative value or prejudice a particular piece of evidence will ultimately have. Therefore, the ruling is better deferred until the situation is clear and not speculative." **Id** at page 52-53

In this case, KINNARD complains that we deferred decisions regarding admissibility of JONES' handwriting expert, testimony of gang-affiliation, and the Commonwealth's use of prison phone calls until the time of trial. All of the above decision implicated a probative value versus prejudicial effect analysis. In an opinion we authored regarding a Motion in Limine on February 6, 2017, we wrote: "As we stated to both counsel repeatedly, we do not have anything close to a perfect understanding of what will be presented at this trial...and we are not prescient." (Slip Opinion

27

at pages 8-9)[5] With this in mind, we will address each of KINNARD's claims pertaining to Motions in Limine.

## 1. Phone Calls

Of all the issues KINNARD believes we should have addressed prior to trial, by far the most significant is the one involving the Commonwealth's use of recorded phone calls from the Lebanon County Prison. With respect to that issue, we authored a nine page written opinion prior to trial. While KINNARD is correct that we deferred a final decision until we were able to hear all of the evidence necessary for a probative value versus prejudicial effect decision, KINNARD conveniently overlooks the fact that we conducted extensive research and apprised the parties of the results of that research before trial even began. In fact, our opinion of February 6, 2017, stated:

"We simply cannot and will not render a final decision regarding admissibility of the Commonwealth's proffered telephone conversations. However, we will communicate the following to all parties:

(1) The DEFENDANT's objections to the Commonwealth's proffer based upon the plea bargain privilege and relevance are overruled.
(2) The Commonwealth will be directed to delay presentation of the evidence regarding the intercepted prison telephone calls until the end of its case in chief. At that time, we will conduct an argument outside the presence of the jury regarding the probative value versus prejudicial effect question.

---

[5] Prior to trial, we were aware that video surveillance evidence existed of events on the night of the homicide. However, we had not seen the video and did not know the detail of what it depicted. Had clear video evidence existed that tied one or both of the Defendants to the shooting that would have impacted our probative value versus prejudicial effect analysis.

28

(3) If we decide to admit the evidence proffered by the Commonwealth we will afford the defense with broad latitude to educate the jury regarding the plea agreement process, and the difficult decisions that the process sometimes creates for defendants charged with crimes.

(4) If the Commonwealth's evidence is admitted, we will carefully craft instructions to the jury that outline how they can and cannot consider the evidence contained in the telephone conversations. Of course, we will solicit input from all counsel regarding these instructions before they are offered." (Slip opinion at page 9)

Given that the phone call issue triggered a probative value vs. prejudicial effect analysis, and given that the communicated our decisions about relevance to privilege prior to trial, the Court did not err in how it addressed the phone call issue.

## 2. Handwriting

With respect to the issue of JONES' handwriting expert, a discussion commenced at a pre-trial proceeding on December 19, 2016. At that time, JONES asked this Court to order KINNARD to provide handwriting exemplars. In response, the following exchange occurred:

"The Court:     What authority do I have to order a defendant to provide handwriting exemplars to another defendant?

Mr. Ehrgood:     I haven't – I researched that case law after reviewing Mr. Sidelnick's motion. I haven't seen anything that says that a defendant can't request those things. If I can subpoena documents, if I can subpoena a person to bring documents into Court and the Commonwealth could compel a defendant to provide a handwriting sample, why couldn't another defense attorney?

The Court:     Because Mr. Kinnard has a constitutional right against self-incrimination." (12-19-16 N.T. 20-21)

29

At the end of the discussion, the Court directed that original letters in the possession of the D.A.'s office be provided to the DEFENDANT's expert. The Court then stated:

"Before we undertake a coercive requirement that Mr. Kinnard write out exemplars, I'm going to make you exhaust your other options. Because if your expert can render an opinion based upon those other letters that are not affected by any taint whatsoever, I'm going to have her do that." (12-19-16 N.T. 23)

We next encountered the handwriting issue when KINNARD filed a Pre-Trial Notion. On January 20, 2017, we issued a Court Order which read, in pertinent part:

"A decision regarding the DEFENDANT's Motion to Exclude Testimony of Sandra Miller Raudabaugh is deferred to trial as it relates to the text of the letters marked as Q-1, Q-2 and Q-3. As it relates to the signatures on Q-1, Q-2 and Q-3, the DEFENDANT's Motion to Exclude Testimony of Sandra Miller Raudabaugh is denied. In addition to the above, the Court finds DEFENDANT KINNARD's challenge to the methodology employed by Sandra Miller Raudabaugh to be somewhat disingenuous. By a prior proceeding, counsel for JARED JONES requested that Mr. KINNARD provide handwriting exemplars to be used by Ms. Raudabaugh in her analysis. Counsel for DEFENDANT KINNARD vehemently objected and stated that his client could not be forced to provide handwriting exemplars. If in fact DEFENDANT KINNARD has now changed his mind and is willing to provide handwriting exemplars, we would direct that said exemplars be provided immediately to Sandra Miller Raudabaugh. Providing said exemplars would then eliminate the concerns raised by DEFENDANT KINNARD in paragraphs 13 and 14 of his Motion." (Court Order at pages 1-2)

This Court next met with counsel at a pre-trial proceeding on February 6, 2017. The handwriting issue was never discussed at this meeting. As far as the Court knew, KINNARD could have provided handwriting exemplars

30

to MILLER and the entire issue raised in the Motion in Limine would then have been obviated. Given this procedural posture, it would not have been prudent for the Court to enter a pre-trial ruling regarding the handwriting exemplars.

Eventually, the Court was required to conduct a hearing outside the presence of the jury during the middle of trial that addressed MILLER's opinions. It was not until this hearing occurred during trial that the Court possessed pertinent information needed to render a final ruling. The information disclosed by MILLER at the hearing during trial was not available to the Court prior to trial, and it would not have been possible for us to have rendered a decision based upon this information prior to trial. Given the procedural posture of the handwriting issue, it would have been neither appropriate nor possible for this Court to have entered any sort of pre-trial ruling.[6]

### 3. Gang Affiliation

With respect to testimony of gang affiliation of the DEFENDANTS, this Court entered an Order on January 20, 2017. As it related to gang affiliation, the Order stated:

---

[6] Following the December 19, 2016, pre-trial meeting with counsel, this Jurist embarked upon a two-week mission trip to the country of Ecuador. The next time that the Court met on the record with counsel was February 6, 2017. Nothing was contained in the record of that meeting regarding handwriting exemplars.

31

"A decision regarding DEFENDANT KINNARD's Motion to Preclude Testimony regarding gang affiliation is deferred until the time of trial. Without further context that can only be provided by testimony at trial, this Court does not have enough information to ascertain whether Mr. KINNARD's gang affiliation will or will not be relevant. Before the Commonwealth seeks to produce evidence of Mr. KINNARD's gang affiliation, it should approach the Bench so that the issue can be discussed outside the presence of the jury." (Court Order at page 2)

At no time during trial did the Commonwealth seek to present information regarding the DEFENDANTS' purported gang affiliation. Therefore, the issue addressed in KINNARD's Motion in Limine was rendered moot.

Legally, there is no duty on the part of a court to render a pre-trial ruling regarding Motions in Limine. Moreover, the factual evolution of this particular trial would have rendered improvident the type of pre-trial rulings that KINNARD now requests. With respect to the most important of the Motions in Limine – the ones regarding the prison phone calls – KINNARD's counsel had a written opinion by the Court that rejected his arguments regarding relevance and the plea bargain privilege. The Court did its best to treat all parties fairly and transparently as it relates to evidentiary disputes. We did not abuse our discretion in the way we addressed those issues.

## F. Prison Phone Call Intercepts (Kinnard)

Considerable time was expended at trial to address the admissibility of telephone conversations between KINNARD and friends that were

intercepted by staff at the Lebanon County Correctional Facility.[7] Five separate issues have been raised by KINNARD regarding admissibility of the intercepted phone calls:

(1) That the contents of the intercepted phone calls were not relevant;

(2) That the intercepted phone calls implicated the so-called plea bargaining privilege;

(3) That the phone interception violated Pennsylvania's Wire Tap Act;

(4) That KINNARD's voice on the phone calls was not properly authenticated; and

(5) That the probative value of the phone call information was outweighed by its prejudicial effect.

## (1) Relevance

## (2) Plea Bargain Privilege

The issues pertaining to relevance and the plea bargaining privilege were addressed in an Opinion we authored on the first day of trial dated February 6, 2017. We incorporate by reference what we wrote. Moreover,

---

[7] Upon admission, every inmate at the Lebanon County Prison is told that all telephone calls will be recorded and every inmate signs a statement indicating awareness of that fact. Before any telephone call is placed or received, a recording is played reminding the inmate that the call will be recorded and is subject to monitoring. The efficacy of this telephone monitoring practice has been approved by this Court and the Pennsylvania Superior Court. See, e.g. *Commonwealth v. Shayne Bechtel*, No. 2011-01670 (Tylwalk, PJ March 23, 2012)

33

we wish to provide some additional context to supplement what we wrote on February 6, 2017.

As we promised in our February 6, 2017 Opinion, we afforded "broad latitude" for the defense to educate the jury regarding the plea bargaining process. KINNARD did just that by calling Christopher Coyle, Esquire, who is one of the senior criminal defense lawyers in Lebanon County. Attorney Coyle described the plea bargaining process for the jury and explained that plea bargains afford a defendant with some assurance in terms of the amount of time he would have to serve.

In addition, we afforded the jury with a specific instruction regarding the telephone calls in question. We stated:

> "The second effect of consciousness of guilt the Commonwealth has presented for your consideration involves the statement of Mr. Kinnard to friends and family members during phone calls that were intercepted by the prison. If you recall, Mr. Kinnard stated to someone that he would accept a plea bargain in this case. He told other family [members] to be prepared, that he would be facing a lengthy period of incarceration.

> The Commonwealth alleges that these statements are proof that defendant Kinnard knew that he had done something wrong. The Commonwealth alleges that Mr. Kinnard knew that he had been involved in a homicide and there would be consequences to attach to that homicide, and that is why he told family members that he was interested in a plea bargain and that he was facing a considerable number of years in prison.

> On the other hand, the defendant argues to you that the statements of Mr. Kinnard merely reflected the reality of the situation confronting him. The defense points out that Mr. Kinnard was facing various serious charges, including homicide, and that Mr. Kinnard knew that these serious charges carried with them serious potential penalties that could include life in prison.

34

The defense argued Mr. Kinnard was simply preparing his family for the possibility that he would be away from them for many years. To support this argument, the defense points out that Mr. Kinnard at no time overtly admitted guilt during these conversations. He even stated that it would serve justice if he won.

It is up to you and you alone to decide whether Mr. Kinnard's statements to friends and family were in fact statements evidencing a guilty conscious. Or whether they were statements made to family members merely communicating the possibility of what could occur.

When you make these decisions, you must consider the content of the statements themselves, and the context in which they were uttered. You must also consider the testimony of Attorney Coyle, who explained the plea bargaining process to you. You should consider what he told you about how plea bargaining will often result in a sentence of less than what the defendant would face if he went to trial and lost. Because of this, people accused of crimes sometimes can be tempted to accept a plea bargain as a sure thing instead of taking their chances at trial and risking even harsher punishment.

These are all factors that you must consider in weighing Mr. Kinnard's statements to his friends and family. Ultimately, you decide whether or how Mr. Kinnard's statements should be considered." (N.T. 776-778.)

As is obvious from the above, the telephone calls presented by the Commonwealth were not considered by the jury in a vacuum. The jury had the benefit of detailed information from Attorney Coyle plus it had the benefit of an instruction from the Court that outlined how the telephone conversations could be considered by the jury. In light of everything we articulated in our February 6, 2017 Opinion and considering everything that occurred at trial thereafter, this Court did not err by allowing the jury to hear KINNARD's telephone calls intercepted from the Lebanon County Prison.

35

### (3) Wire Tap Violations

KINNARD references somewhat in passing that the interception of his telephone calls at the Lebanon County Prison violated Pennsylvania's Wire Tapping and Electronic Surveillance Control Act. This is not an argument that was focused upon at trial. Nevertheless, we will briefly address it.

Pennsylvania's Wiretapping and Electronic Surveillance Control Act outlaws the intentional interception of a wire, electronic or oral communication. 18 Pa. C.S.A. §5703(1). The purpose of Pennsylvania's Wiretap Act is to protect private communications. *Commonwealth v. DeMarco*, 578 A. 2d 942 (Pa. Super. 1960). An exception to the Act exists when the parties to a conversation consent to its interception. 18 Pa. C.S.A. 5704(2)(ii).

The question of whether a telephone conversation at a prison can be lawfully recorded by police is one that has been addressed by the Pennsylvania Supreme Court and by this Court. In *Commonwealth v. Baumhammers*, 960 A. 2d 59 (Pa. 2008), our Commonwealth's highest Court declared that when a defendant is notified that his telephone conversations in prison could be recorded, it is not unlawful for prison officials to do just that and the subsequent recording of the conversation is not subject to suppression.

In *Commonwealth v. Shayne Bechtel*, No. 2011-01670 (Tylwalk, PJ March 23, 2012), President Judge Tylwalk of this Court addressed the

36

lawfulness of intercepting telephone calls at the Lebanon County Correctional Facility. In rejecting an argument by the defendant based upon a so-called right to privacy, Judge Tylwalk wrote:

> "Although *Bechtel* raises the issue of a violation of his right to privacy, we find no support for his averment that he had an expectation of privacy during his telephone calls placed from LCCF. Exhibit # 1 clearly contains language putting inmates, and in this case specifically, Bechtel, on notice that all telephone calls are subject to possible monitoring and recording. (Exhibit #1). In addition, at the beginning of each call, as recorded on Exhibit #3, there is an oral admonishment "This call may be monitored or recorded." In light of these facts, we believe that it is disingenuous to argue that an inmate has an expectation of privacy during telephone calls placed from LCCF...where there is both written notice provided to an inmate and a computer generated message on the telephone itself audible to both the inmate and the call's recipient, there exists [no] expectation of privacy and no violation of Pennsylvania's Wiretap Act."

In this case, Michael Stuckey of the Lebanon County Correctional Facility testified in a Pre-Trial hearing conducted on the morning of the first day of trial. Mr. Stuckey testified that he managed the prison phone system. (N.T. 4). He testified that all inmates are advised when they enter LCCF that their phone calls and visits will be monitored and recorded and that each inmate signs a statement verifying his/her awareness of this policy. (February 6, 2017 N.T. 4) Mr. Stuckey provided a copy of a document signed by KINNARD indicating "I understand and agree that telephone calls and visitation calls are subject to monitoring, recording and may be

37

intercepted or divulged." (February 6, 2017 N.T. 5-6)[8]  Clearly, any argument made by KINNARD based upon the Wiretap Act must be rejected. KINNARD was advised by the prison that his telephone calls and his telephone visitations would all be recorded.  He therefore had no expectation of privacy.  His argument based upon the Wiretap Act will therefore be rejected.

## (4) Voice Identification

At Trial, the Commonwealth proposed to authenticate KINNARD's voice through the testimony of two police officers. We conducted a hearing outside the presence of the jury to dig deeper into the voice identification.

Sergeant Jonathan Hess testified that he was one of the officers that transported KINNARD from the location of his arrest in Arizona to Pennsylvania. (N.T. 347). Sergeant Hess had numerous conversations with KINNARD during this time. (N.T. 348). However, the transport conducted by Sergeant Hess occurred approximately one year before he listened to the intercepted telephone conversation and Sergeant Hess acknowledged that he did not speak with KINNARD during the intervening time period. Moreover, when Sergeant Hess was asked whether there was

---

[8] The focus of Mr. Stuckey's testimony was upon the interception of one of KINNARD's conversations with a visitor at the Prison via the Prison visitor phone system.  Mr. Stuckey stated that "As soon as the inmate and the visitors pick up the phone, the first thing that comes over the phones is the call will be monitored and recorded." (February 6, 2017 N.T. 8).  We are aware from prior proceedings that this identical admonition is played whenever a telephone call is placed from the prison to an outside telephone line.

38

anything unusual about KINNARD's voice, he stated simply: "The thing that sticks out to me in my mind is he's a large man. I would expect a deeper voice out of a large man. His voice was a little bit of a higher pitch that I would have expected from him." (N.T. 352-353). We held that Sergeant Hess' testimony was not sufficient to authenticate KINNARD's voice on the recorded telephone call.

The Commonwealth also presented Detective Keith Uhrich. Detective Uhrich testified that during the course of his investigation, he listened to 150 telephone calls that were intercepted from KINNARD while he ws an inmate at the Lebanon County Prison. (N.T. 354). Detective Uhrich stated that some of these telephone calls were twenty minutes in length. (N.T. 363) and that he listened to KINNARD's telephone calls "for a long period of time" extending up to one week before the date of trial. (N.T. 356). Detective Uhrich also stated that KINNARD repeatedly prefaced many of his remarks with the phrase "Do you understand what I'm sayin'?" Detective Uhrich stated that during the conversation the Commonwealth sought to admit, KINNARD's voice sounded identical with the voice he heard 150 times previously and KINNARD used the phrase "Do you understand what I'm sayin'?". We concluded based upon all of the above information that Detective Uhrich's knowledge of KINNARD's voice was significantly better than was Sergeant Hess and we permitted Detective Uhrich to testify about his identification of KINNARD's voice.

39

"It is well settled that a witness may make an identification by voice alone." *Commonwealth v. Miller*, 560 A. 2d 229 (Pa. Super. 1989). The Court of Common Pleas of Lehigh County recently addressed a case similar to this one where voice identification was proffered through a police officer. In *Commonwealth v. Ramos*, 3 Pa. D & C 5th 514 (2008), the Court stated:

"The identity of a speaker on an audiotape may be identified by a person who recognizes the voice on the tape recording as belonging to a certain individual. In order to accomplish the identification in this manner the Commonwealth must lay a foundation that the witness has a basis for familiarity with the voice he is identifying. See, Pa. R. Ev. 901 (b)(5). See, *Commonwealth v. Carpenter*, 372 A. 2d 806 (Pa. 1977) (Identification by acquaintance who then passed receiver to officer); See also, *U.S. v. McCartney*, 264 F. 2d 628 (7th Cir. 1959) (Police officer can identify voice after hearing voice several times over the telephone and talking to defendant once in person). Here, Officer Cruz can identify the voice of the defendant on the tape because he has heard the voice of the defendant on several occasions. Officer Cruz overheard the defendant speak with the confidential informant on June 20, 2006, he reviewed the tape recording of the conversations between the defendant on the confidential informant on several occasions and he spoke with the defendant for thirty to forty minutes at the police station on October 11, 2006. In addition, Officer Cruz has listened to approximately twenty telephone conversations involving the defendant from prison. Each of these prison telephone conversations were about fifteen minutes in length. These experiences give Officer Cruz the requisite familiarity with the defendant's voice to offer identification testimony at trial.

It is noteworthy that other courts have permitted voice identification testimony even in cases where the identifying witness had only a very brief conversation with the accused. See, *U.S. v. Vento*, 533 F. 2d 838,864-65 (3rd. Cir. 1976). The frequency of the contact between the witness and the defendant goes to the weight of the evidence not to its admissibility. Hence, it is the province of the jury to decide whether Officer Cruz's prior interactions with the defendant are a sufficient basis to identify the defendant's voice." Id at page 521.

40

The voice identification in this case by Detective Uhrich clearly meets the standard articulated in *Ramos*. Accordingly, this Court did not err by allowing Detective Uhrich to identify KINNARD's voice.

## (5.) Probative Value vs. Prejudicial Effect

Pennsylvania Rules of Evidence contains an omnibus provision authorizing Trial Courts to employ a probative value vs. prejudicial effect analysis with respect to controversial evidence. See, Pa. R. Ev. 403. When an objection under Rule 403 is proffered, Trial Courts are required to conduct a "cost and benefit" analysis that considers the entirely of the record. *Commonwealth v. Hicks*, 91 A. 3d 47 (Pa. 2014).

In this case, we authored an Opinion of February 6, 2017, regarding the Commonwealth's desire to introduce conversations from KINNARD that were intercepted while he was an inmate at the Lebanon County Correctional Facility. We specifically deferred a probative value vs. prejudicial effect ruling until the time of trial. Once the Commonwealth had presented most of its evidence, we heard argument from counsel regarding KINNARD's Rule 403 objection. Specifically, KINNARD raised the following allegations of prejudice:

- Possible confusion of the jury. (N.T. 370)
- Allowing the jury to hear evidence of punishment, which is ordinarily not admissible. (N.T. 370)

41

- What KINNARD was actually communicating in the intercepted calls was that he understood the reality of his situation; the calls were not confessions. (N.T. 371).

Following argument by the Commonwealth, the Court rendered a decision that allowed the tape recorded evidence to be heard by the jury. In rendering this decision, the Court stated:

> "This is not a case where we have an eyewitness – even – I take that back. I am not going to say that. I want to say this correctly. There were a whole bunch of eyewitnesses. But there is not anyone who has come forward to say what they saw or that they were in a position to see anything in terms of who shot the gun.
>
> We don't have any eyewitnesses come in here and said, Richard Kinnard was the shooter. The videotapes are helpful, but none of them show the actual shooter. None of them show the gun actually in the hands of anyone.
>
> So what we have here is largely a case of circumstantial evidence. In that context, I think the jury should have as many pieces of the puzzle as they possibly can have. So I am under the circumstances inclined to admit this evidence and allow both of you to argue its import and its weight to the jury." (N.T. 376)

To supplement what we articulated at Trial, we will today respond to the three specific arguments of prejudice outlined by KINNARD. Our response is as follows:

- We do not perceive a risk of significant confusion based upon the contents of the telephone calls. While we understand that plea bargaining is often misunderstood by lay people, the risk of that occurring in this case is minimal because we permitted KINNARD to call Attorney Coyle as a witness to describe the

42

plea bargaining process and the difficult decisions that defendants must make once a plea bargain is offered. To the extent that the telephone calls could have created confusion, that confusion was certainly ameliorated or eliminated altogether by the testimony of Attorney Coyle.

- With respect to punishment, we do not believe that the contents of KINNARD's telephone call informed the jury of anything it already did not know. The jury knew that it was deciding a homicide. Every citizen knows that homicide carries with it serious consequences. Jurors likely recognized that life in prison was among the possible consequences for a homicide.

- KINNARD's final argument of prejudice focuses upon his intent that formed the foundation for his statements. The Commonwealth argued that KINNARD's statements evidenced his consciousness of guilt. KINNARD alleged that they simply reflected an understanding of the reality of what was confronting him. Ultimately, it was the juries' job to decide how to interpret and weigh the information contained in the telephone calls. We afforded the jury with an extensive instruction to assist it in making this decision (N.T. 776-778). With this instruction, we are confident that the jury could discern how and to what extent the intercepted calls should or should not be considered.

43

Generally speaking, a Trial Judge is vested with broad authority to weigh the probative value and prejudicial effect of proffered evidence. See, *Commonwealth v. Hoover*, 107 A. 3d 723 (Pa. 2014). Appellate Courts may reverse an evidentiary ruling only when the Trial Court has "abused its discretion". *Commonwealth v. Laird*, 988 A. 2d 618 (Pa. 2010). "A determination that a Trial Court abused its discretion in making an evidentiary ruling 'may not be made merely because an Appellate Court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous.'" *Commonwealth v. Hoover*, Supra. at page 610, quoting *Commonwealth v. Sherwood*, 982 A. 2d 483 (Pa. 2009).

In the context of Rule 403, it is incumbent upon the Court to remember that all evidence presented by the prosecution is intended to be prejudicial to the defense. Our Appellate Courts have often stated "Evidence will not be prohibited merely because it is harmful to the defendant." *Commonwealth v. Dillon*, 925 A. 2d 131, 141 (Pa. 2007). Rather, our Commonwealth's highest court has described an analysis under Pa. R. Ev. 404(b) as follows:

> "The probative value of the evidence might be outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, undue delay, pointlessness of presentation, or unnecessary presentation of cumulative evidence. Pa. R. Ev. 403. The comment to Pa. R. Ev. 403 instructs that: 'Unfair prejudice means a tendency to suggest decision on an improper basis or to divert the jury's attention away from its duty of weighing the evidence impartially.' Pa.

44

R. Ev. 403 comment. Additionally, when weighing the potential for prejudice, a Trial Court may consider how a cautionary instruction might ameliorate the prejudicial effect of the proffered evidence. Pa. R. Ev. 404(b) comment..." **Id** at page 141

In this case, the Court undertook its duty to weigh probative value and prejudicial effect of the intercepted telephone calls. We ruled in favor of giving the jury "all available pieces of the puzzle" so that it could make a decision as fair as possible under the circumstances. By so ruling, this Court did not err.

## G. Handwriting Authentication (Kinnard)

As part of his defense, JONES proffered an exculpatory letter that he alleged was written by KINNARD. Both KINNARD and the Commonwealth objected to the authenticity of this letter. Because of this, JONES hired MILLER. Prior to trial, MILLER was given numerous documents known to have been written by KINNARD[9]. She stated in a report that she could positively declare that the signature on the exculpatory letter was that of KINNARD. She also stated that there was a "strong probability" that the rest of the letter was also written by KINNARD. Both the Commonwealth and KINNARD objected to JONES' effort to authenticate the exculpatory letter based upon MILLER's testimony.

---

[9] The letters known to have been written by KINNARD included a letter identified by the mother of one of KINNARD's children (N.T. 460-461) and numerous records from the Lebanon County Prison. (N.T. 465,467-468,470-471).

45

Before the exculpatory letter was admitted, the parties questioned MILLER extensively about her analysis and opinion. (N.T. 473-515). Unfortunately, MILLER refused to be tied down regarding the nature of her opinion. After about one and one-half hours of dealing with the handwriting authentication issue, the Court excused the jury from the Court Room and cut to the proverbial chase by asking outside the presence of the jury:

> "Q. Do you have an opinion to a reasonable degree of certainty as to whether the totality based on everything that you've looked at whether the author of the Q document was the author of the K document?
>
> A. I do.
>
> Q. What is that opinion?
>
> A. The K-1 writer did write it." (N.T. 522).

Following this affirmation by MILLER that her opinion was rendered to a reasonable degree of certainty, the Court issued the following ruling:

> "I will allow her to give that opinion in that way...if you guys want to parse words and go in and dig deeper, you can parse words and dig deeper. The jury will determine the weight...I am going to rule that it [the letter] is authentic. There is no objection as to its substance. So it can be read. When we come back after a break, it can be read to the jury after she renders her opinion as she has just done." (N.T. 522-523)

In order to admit any document, the moving party must prove its authentication. The bar for establishing authentication is not difficult to hurdle; "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Pa. R. Ev. 901(a).

46

Our Superior Court has stated that "The ultimate determination of authenticity is for the jury. A proponent of a document need only present a prima facie case of some evidence of genuineness I order to put the issue of authenticity before the fact finders." *Commonwealth v. Brooks*, 508 A. 2d 316, 320 (Pa. Super. 1986). The Court in *Brooks* also stated:

> "A document may be authenticated by direct proof, such as the testimony of a witness who saw the author sign the document, acknowledgment of execution by the signer, admission of authenticity by an adverse party, or proof that the document or its signature is in the purported author's handwriting." **Id** at page 318

Absent a clear abuse of discretion, a trial court's decision regarding authenticity will not be disturbed on appeal. *Commonwealth v. Davies*, 811 A. 2d 600 (Pa. Super 2002).

With respect to a handwritten document, the style of an author's handwriting can be used to authenticate the document. Experts familiar with handwriting analysis can provide testimony to establish such authentication. The standard is whether the expert can identify the author's handwriting "to a reasonable degree of certainty". See Pa. R. Ev. 702.

In this case, MILLER was asked by the parties about her analysis of KINNARD's signature as well as the handwritten narrative. She was definitively able to identify KINNARD's signature on the exculpatory letter. With respect to the remaining narrative, she simply stated that there was a "strong probability" that KINNARD wrote that narrative. After all counsel repeatedly asked questions about the strength of MILLER's opinion, the Court noted that counsel would not ask and/or MILLER would not answer

47

the question of whether she would opine to a reasonable degree of certainty whether the letter read as a whole (signature and narrative) was written by KINNARD. Therefore, at a time when the jury was not in the Court Room, the Court specifically asked this critical question. In response, MILLER stated that she could opine that the exculpatory letter was written by KINNARD "to a reasonable degree of certainty". Accordingly, we declared the letter to be authentic and admitted it. By doing so, we did not err.

## H. Identification using JNET photo (Kinnard)

In his brief, KINNARD proffers a one paragraph argument that the Court erred by permitting Detective Keith Uhrich to testify that he identified KINNARD by using a JNET photo. The implication of KINNARD's argument is that the jury would realize from context that KINNARD had a prior criminal record. KINNARD argues that this record should not have been made known to the jury.

We have reviewed the totality of Detective Uhrich's testimony at trial. At no point did Detective Uhrich reference a photograph of KINNARD from JNET. In fact, all Detective Uhrich stated to the jury is that he was able to identify numerous people during the course of his investigation. He mentioned "Jose LeBron, Jocelyn Colon, Joseph Guzman, Michael Rivera, Iovanni Estrada, Rose Acevedo, Richard Kinnard, Jared Jones and Jose Rivera." (N.T. 323). He did not link any of these individuals to a photo from JNET. Given this context, we will not spend any more time addressing KINNARD's JNET photo issue than he did in raising it.

48

## IV. CONCLUSION

We freely acknowledge that this case was a challenge to try. All counsel involved were capable and passionate about their respective positions. Whenever an issue could be raised, it invariably was. Some of these issues required us to conduct hours of research at night and during weekends during trial...and one of these issues even required us to analyze decisional precedent from as far away as California.

As much as this case presented a challenge, we are confident that in the end, this Court was able to reach decisions that enabled the jury to fairly assess all available and legally permissible information. The jury obviously considered all of this information and concluded that both KINNARD and JONES were responsible for the murder of Corey Bryan. Nothing that has been presented to us via Post-Sentence Motions has caused us to second guess the decision of the jury, or any of our rulings during Trial. We therefore deny all of the Post-Sentence Motions submitted by the defense.

49